**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____
                                              )
IN RE:                                        )
                                              )
McCOOK METALS, L.L.C. and                     )
McCOOK EQUIPMENT, L.L.C.,                      )
                                              )
        Debtors.                              )
_____)
                                              )
JOSEPH A. BALDI, as Chapter 7 Trustee         )
of McCook Metals, L.L.C.,                      )
                                              )   **No. 05 C 2990**
        Plaintiff,                            )
                                              )   **Judge Rebecca R. Pallmeyer**
        v.                                    )
                                              )
SAMUEL SON & CO., LIMITED and                 )
SAMUEL SON, CHICAGO, LTD.,                     )
                                              )
        Defendants.                           )
_____)

## MEMORANDUM OPINION AND ORDER

Longview Aluminum, LLC ("Longview") voluntarily filed for bankruptcy in the United States

Bankruptcy Court for the Northern District of Illinois in March 2003.   In August 2003, William A.

Brandt was appointed as trustee (the "Longview Trustee").   In September 2003, the Longview

Trustee brought adversary proceedings against: (1) Samuel, Son & Co., Ltd. and Samuel, Son

Chicago, Ltd. ("Samuel"); (2) Dynegy Marketing and Trade ("Dynegy"); and (3) Jenkens & Gilchrist,

LLP ("Jenkens") (together, the "Defendants") to recover property transferred to Defendants between

March 2001 and March 2002.  The Trustee contends Longview was insolvent and undercapitalized

at the time of these transfers and seeks recovery of the value of that transferred property, under

sections 544, 548, and 550 of the Bankruptcy Code as well as sections 5 and 6 of the Illinois

Uniform Fraudulent Transfer Act ("UFTA").   Following a bench trial, Bankruptcy Judge Eugene R.

Wedoff concluded that Longview was neither insolvent nor undercapitalized between March 2001

and March 2002 and dismissed the Trustee's claims. The Longview Trustee appeals. For the reasons explained below, this court affirms the Bankruptcy Court's holding.

## BACKGROUND

The Longview bankruptcy case is related to the McCook Metals, LLC ("McCook") bankruptcy proceedings. McCook was controlled by Michigan Avenue Partners, LLC ("MAP"), the same company that formed Longview. *In re Longview Aluminum, L.L.C.*, Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *1 (Bankr. N.D. Ill. July 14, 2005). This court will not repeat in full the factual explanation contained in *In re Longview*, 2005 WL 3021173 and *In re McCook Metals, L.L.C.*, 319 B.R. 570 (Bankr. N.D. Ill. 2005), but a summary of Judge Wedoff's factual findings will be useful on this appeal.[1]

In 1941, Reynolds Metal Co. ("Reynolds") built the Longview smelter, an aluminum smelter located along the Columbia River in Longview, Washington. (Longview Aluminum, LLC Trustee's Opening Memorandum on Appeal ("Opening Mem.") at 5.) The Longview smelter produced various types of aluminum ingot. *In re Longview*, 2005 WL 3021173, at *3. It consisted of a south plant, built in 1941, and a north plant, built in 1966, each of which had three production lines, a cast house, and ancillary facilities; the north plant also had additional features. *Id.* MAP formed Longview in November 2000, to purchase the Longview smelter. *Id.* at *1.

In 1999, Alcoa, Inc. ("Alcoa") merged with Reynolds. *In re Longview*, 2005 WL 3021173, at *2. Several competitors, including MAP, filed antitrust complaints in connection with this merger,

---

[1]    *In re McCook* explains the judgment on the McCook Trustee's adversary proceedings against Michael Lynch, a founder of MAP, which were tried before Bankruptcy Judge Wedoff in August 2004. 319 B.R. at 577 n.1. Judge Wedoff ultimately entered judgment for the McCook Trustee and against Lynch in the amount of $2,744,000 on three fraudulent transfer claims and, in the alternative, judgment for the McCook Trustee and against Lynch in the amount of $1,637,993 on a common law breach of fiduciary duty claim. *Id.* at 577. In that same proceeding, Lynch brought claims against the debtor's estate. *Id.* Judge Wedoff disallowed Lynch's claims pending payment of the judgment against him but ruled that any subsequently allowed claim by Lynch would not be equitably subordinated. *Id.*

and the European Commission ultimately ordered Alcoa–the post-merger entity–to divest at least 25% of the Longview smelter and Reynolds' alumina refinery. *Id.*[2] In the fall of 2000, MAP negotiated with Alcoa an asset purchase agreement, by which Longview would purchase 100% of the smelter assets for $140 million. *Id.* Longview obtained the rights to operate and own smelter equipment, inventory, and raw materials, as well as a 99-year lease of the land on which the smelter was located. *Id.* at *1. Longview's largest operating expenses were anticipated to be alumina, electric power, and the union workforce, and MAP negotiated contracts related to each. *Id.* at *2. In particular, MAP executed an alumina supply agreement, by which Longview agreed to purchase 120,000 metric tons of alumina from Reynolds by the end of 2002. *Id.* Longview also assumed an electric power contract, referred to as the Block Power Sales Agreement, with the Bonneville Power Administration ("BPA"), a federal agency, running from October 1, 2001 through September 30, 2006. *Id.* at *2.

Around the same time, faced with unprecedented energy demands created by the California energy crisis, the BPA offered to repurchase the allocated electrical energy of certain aluminum smelters willing to temporarily curtail operations. (Opening Mem. at 6.) MAP negotiated a Curtailment Agreement for Longview, in which the BPA agreed to pay Longview $226 million to curtail its use of electric power and cease operations at the smelter between February 26, 2001, and June 30, 2002 (the "curtailment period"). *In re Longview*, 2005 WL 3021173, at *2. In conjunction with the Curtailment Agreement, Longview took on certain liabilities. First, as Longview intended to fully resume operations at the smelter in July 2002, MAP agreed that Longview would begin to take a reduced level of power from the BPA on April 1, 2002. *Id.* at *2 n.3. Second, until operations resumed, MAP agreed that Longview would pay "normal wages and benefits to union

---

[2] Alumina is a form of aluminum oxide that, through the smelting process, can be transformed into aluminum metal. *See* What is Alumina?, *available at* http://www.alcoa.com/ alumina/en/info_ page/alumina_defined.asp.

3

employees." *Id.* at *2.[3] Third, MAP agreed with the United Steelworkers of America that MAP would: begin construction on a power generator by July 1, 2001; make an equity investment of up to $36 million to build the power generator if financing was otherwise unavailable; and grant the unions a minimum $50 million security interest in the smelter by September 20, 2001. *Id.*; *see also* Opening Mem. at 7.[4]

During the curtailment period, MAP caused Longview to make payments to certain creditors of MAP, Longview, and other MAP-controlled entities. *In re Longview*, 2005 WL 3021173, at *4. Of particular relevance are the payments Longview made to the Defendants: (1) Sixteen payments to Samuel totaling $2,216,125 between June 2001 and March 2002, which repaid a $2.5 million royalty advance Samuel extended in connection with its purchase of a distribution business from another entity controlled by MAP's principals; (2) A payment of $369,400 to Dynegy on July 26, 2001 for natural gas delivered to McCook in May 2001; and (3) Eight payments to Jenkens totaling $762,687.46 between March 2001 and February 2002 for legal services provided to MAP, McCook, and Longview. *Id.* Together, these payments are the disputed transfers the Longview Trustee seeks to avoid.

According to Longview's vice chairman, John Kolleng, the company "fully intended and expected to restart" operations at the smelter in April 2002. *In re Longview*, 2005 WL 3021173, at *3. Longview's plant manager, Louis Locke, also testified that Longview planned to resume operations in the north plant. *Id.* But following the curtailment period, Longview's plans to re-open the smelter fell through. *Id.* The cost of electric power was high and the global price of aluminum was low in April 2002. *Id.* Thus, "[b]y April 2002, the aluminum industry in the Pacific Northwest was essentially non-operational." *Id.* On March 4, 2003, Longview filed a voluntary Chapter 11

---

[3]     The details of this obligation are not explained in the record before the court.

[4]     It is not clear from the record before the court when MAP and the union entered into this agreement.

4

Bankruptcy petition, and Judge Wedoff approved Brandt's appointment as the Longview Trustee five months later.

The Trustee brought adversary proceedings against Samuel, Dynegy, and Jenkens, which were consolidated before Judge Wedoff. In these proceedings, the Longview Trustee seeks to recover the disputed transfers from Longview to the Defendants, pursuant to federal bankruptcy law (11 U.S.C. §§ 548 & 550) and Illinois state law (11 U.S.C. § 544 and 740 ILCS 160/5-6 & 10). Judge Wedoff concluded that the Trustee is not entitled to recover the value of the disputed transfers, *In re Longview*, 2005 WL 3021173, at *12, and the Longview Trustee appeals.[5]

### DISCUSSION

**I.    Jurisdiction**

The Longview Trustee has appealed from Judge Wedoff's final judgment, *In re Longview* 2005 WL 3021173. The court has jurisdiction over this appeal from the final judgments entered in favor of each Defendant on all counts pursuant to 28 U.S.C. § 158.

**II.    Insolvency**

**A.    The Legal Standard**

The Longview Trustee contends, first, that the disputed transfers are void due to Longview's insolvency. (Opening Mem. at 11-13.) The Bankruptcy Code provides that a trustee may avoid a debtor's transfer made on or within one year before the date of the filing of the petition if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent

---

[5]    Because of the procedural history of this appeal, the caption for this case does not accurately identify the parties whose interests are at stake here. In total, eight related cases are consolidated before the court, including the Longview Trustee's claims against Samuel, Dynegy, and Jenkens as well as similar claims brought by the McCook Trustee against Samuel and Jenkens. Judge Wedoff found that the assets transferred were exclusively Longview property and thus that McCook is not entitled to recover the transfers. (Opening Mem. at 4.) The McCook Trustee does not pursue his appeals here, because it is undisputed that the transfers at issue were not of McCook property. (*Id.* at 4-5.) The McCook bankruptcy estate maintains an interest in this appeal because of a stipulated settlement, which allocates the proceeds of recovery between the Longview and McCook bankruptcy estates. (*Id.* at 5 n.4.)

on the date that such transfer was made." 11 U.S.C. § 548(a)(1).[6]  The Longview Trustee also contends that Longview property was transferred in violation of section 6 of the UFTA.  (Opening Mem. at 12.)  A trustee may avoid a debtor's transfer, if that transfer is "voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b); *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide)*, 139 F.3d 574, 576-77 (7th Cir. 1998) ("under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law").  The substantive provision of the UFTA is nearly identical to § 548 of the Bankruptcy Code: under the UFTA, a debtor's transfer is fraudulent as to a creditor if the debtor did not receive "a reasonably equivalent value in exchange for the transfer" and the debtor "was insolvent at that time."  740 ILCS 160/6(a).[7] Under either section 544 or 548, the Trustee, if he can establish that a transfer is voidable, is entitled to recover the value of the property transferred.  11 U.S.C. § 550(a).

Thus, the Longview Trustee may recover the value of a disputed transfer if: (1) The property transferred belonged to Longview; (2) Longview did not receive a reasonably equivalent value in exchange for the transfer; and (3) Longview was insolvent at the time of the transfer.  *See* 11 U.S.C. §§ 544(b), 548(a)(1), 550(a); 740 ILCS 160/6(a).  In this appeal, the only contested issue is whether Longview was insolvent between February 26, 2001 and April 1, 2002, the time of the

---

[6]        In April 2005, section 548 was amended to enable trustees to void transfers made by an insolvent or undercapitalized entity on or within two years before the date of filing of the bankruptcy petition.  This timeframe, however, is only applicable to cases commenced more than one year after that amendment.

[7]        The UFTA, however, provides a different timeline than section 548 of the Bankruptcy Code, which enables a trustee to avoid fraudulent transfers made within one year of the Bankruptcy filing if the action is brought within "the earlier of--(1) the later of--(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee . . . ; or (2) the time the case is closed or dismissed."  11 U.S.C. § 546(a).  Under section 6 of the UFTA, an action must be brought within four years of the disputed transfer.  740 ILCS 160/10(b).  There is no allegation here that the Longview Trustee did not bring this action within the proper timeframe.

disputed transfers.  (*See* Opening Mem. at 2-3.)[8]  Under the Bankruptcy Code, an entity is insolvent if it is in a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."  11 U.S.C. § 101(32)(A).  Likewise, the UFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  740 ILCS 160/3(a).  In other words, "balance-sheet solvency determines whether the payments to creditors in the present case were voidable preferences."  *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990).

The Longview Trustee bore the burden of persuading the trier of fact that Longview was insolvent on those dates.  *In re Taxman*, 905 F.2d at 168.[9]  To meet its burden of persuasion, the Longview Trustee must prove Longview's insolvency by a preponderance of the evidence.  *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 853 (Bankr. N.D. Ill. 2007); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error

---

[8]  Defendants argue that the Bankruptcy Court never reached the question of whether Longview received reasonably equivalent value for the transfers.  (Joint Brief of Defendants/Appellees/Cross-Appellants ("Defs.' Mem.") at 26-27.)  The Longview Trustee replies that, in court on March 24, 2005, the Bankruptcy Court held that Longview received no consideration for the disputed transfers. (Longview Aluminum, LLC Trustee's Reply Brief on Appeal ("Reply") at 13.)  To the contrary, as the court reads Judge Wedoff's statements on the transcript page cited by the Longview Trustee, his comments relate exclusively to the issue of whether the assets in question belonged to Longview or to McCook.  (3/24/05 Tr. at 8.)  The bankruptcy court noted that this finding had "no connection" to the question of whether the transfers of Longview property were in violation of the Bankruptcy Code.  (*Id.* at 9-10.)  This court can locate no finding of fact with respect to the issue of consideration and therefore does not reach the issue.

[9]  In the Seventh Circuit, Defendants bear the initial burden of producing evidence that Longview was solvent on the dates of the disputed transfers.  *In re Taxman*, 905 F.2d at 168.  The court notes that the bankruptcy court did not consider this initial burden of production but rather held that "[t]he trustee has the burden of proof on all the elements of a fraudulent transfer and of the grounds for recovery."  *In re Longview*, 2005 WL 3021173, at *5; *see also In re Frierdich*, 294 F.3d 864, 867 (7th Cir. 2002) (holding, in the context of an actual fraud case, that "[t]he burden of proving a fraudulent transfer under § 548 is on the trustee."); 5 COLLIER ON BANKRUPTCY § 548.10 (15th ed.) ("The burden of proof of establishing the existence of the elements of a voidable transfer under section 548 of the Bankruptcy Code rests on the trustee.  This burden of proof never shifts.").  There is, however, no claim that Defendants failed to meet this initial burden of production.

between litigants, we presume that this standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake.") (internal quotation marks and citation omitted).[10]

Courts apply the rule of retrojection when evaluating the solvency of a debtor. *See Barber v. Prod. Credit Servs. of W. Cent. Ill. (In re KZK Livestock, Inc.)*, 290 B.R. 622, 625 (Bankr. C.D. Ill. 2002). Under that rule, a trustee may meet his or her burden by demonstrating that "the debtor was insolvent at one point in time and then prov[ing] that the same condition existed at the time of the subject matter transfer." *Id.* As one court has explained it, the rule of retrojection "provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates, the debtor is deemed to have been insolvent at all intermediate times." *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 276 (Bankr. D. Del. 2005) (internal quotation mark and citation omitted), quoting *Murphy v. Nunes (In re Terrific Seafoods)*, 197 B.R. 724, 731 (Bankr. D. Mass. 1996), quoting *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 300 (Bankr. D. Mass. 1983). The parties do not dispute that the rule of retrojection was appropriate in this case. (*See* Opening Mem. at 13.) Thus, to recover the value of the disputed transfers, the Longview Trustee must prove that: (1) Longview was insolvent on February 26, 2001; (2) Longview was insolvent on April 1, 2002; and (3) there was no substantial change in Longview's assets or liabilities between February 26, 2001 and April 1, 2002.

None of these legal standards is in dispute. (Opening Mem. at 11-13; Defs.' Mem. at 9-26.)

---

[10]     The bankruptcy court recognized a dispute as to whether fraud must be proven by a preponderance of the evidence or clear and convincing evidence. *In re Longview*, 2005 WL 3021173, at *5. Holding that the Longview had not met its burden under either standard, the bankruptcy court declined to address the conflict. *Id.* The court also declines to address the conflict here, as the Longview Trustee fails to meet even the more lenient preponderance standard.

The only question is whether, under this standard, Longview was insolvent at the time of the disputed transfers.

### B.     Standard of Review

The Bankruptcy Court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." FED. R. BANKR. P. 8013.  The court cannot disturb the bankruptcy court's findings "simply because [the district court] is convinced it would have decided the case differently." *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) (citation omitted).  Questions of law, however, are reviewed *de novo.  Id.*

The parties disagree as to the proper standard of review for the bankruptcy court's determination that Longview was not insolvent at the time of the disputed transfers.  Without citing any legal authority, the Longview Trustee argues that insolvency is either a question of law or a mixed question of law and fact, which should be reviewed *de novo.*  (Reply at 2-3.)  In the Seventh Circuit, however, insolvency is a question of fact.  *Plankinton Bldg. Co. v. Grossman*, 148 F.2d 119, 125 (7th Cir. 1945) ("It is next contended by appellants that the court erred in holding that the debtor was unable to meet its maturing debts, and that it was insolvent. These are questions of fact."). *Accord, Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 384 (3d Cir. 2007) ("Whether a corporation is insolvent, and when it becomes  so, are issues of fact."); *Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070, 1073 (9th Cir. 2000) ("Findings of fact, such as the finding of insolvency, are reviewed for clear error."); *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996) ("The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency. Insolvency is a question of fact, and the findings of the Bankruptcy Court in this regard will not be disturbed unless they are clearly erroneous.") (internal citations omitted).   The bankruptcy court's valuation of Longview should therefore be reviewed for clear error.  *Cf. Mungo*, 355 F.3d at 974-97 (reviewing valuation of marital

estate in bankruptcy proceedings, including allegations that the wrong legal standard was applied, for clear error).

Nevertheless, because the parties have vigorously contested the issue, the court will also consider whether more searching review is appropriate if insolvency is considered a mixed question of fact and law. Relying on *Mungo*, 355 F.3d at 974-97, the Longview Trustee argues that the bankruptcy court's mixed conclusions of fact and law, including application of laws to fact, must be reviewed *de novo*. (*See* Reply at 3.) The Longview Trustee further argues that all the disputed issues on appeal fall into these categories and should be reviewed *de novo*. (*Id.*)

Again, however, the Trustee's position is inconsistent with Seventh Circuit authority. The application of a legal standard, such as insolvency, to the pure facts to yield a legal conclusion, or finding of ultimate fact, is generally reviewed for clear error. *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002).[11] This is true, first, because resolving an ultimate question of fact is case-specific. *Id.* The law must be consistent from one courtroom to another, but because "divergent *applications* of law to fact do not unsettle the law--doctrine is unaffected--a heavy appellate hand in these cases is unnecessary to assure the law's clarity and coherence." *Id.* In addition, the trial court is likely to better understand and appreciate the particular facts than is the appellate court, making its resolution of the ultimate question of fact more accurate. *Id.* at 308. This is especially sensible where, as here, the question essentially involves drawing a series of factual conclusions, which the trial court is best equipped to make. *Id.*; *see also Sehie v. City of Aurora*, 432 F.3d 749, 751 (7th Cir. 2005) ("We will also review any application of the law to the facts for clear error"); *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002) ("Where both the relevant law and the specific facts are clear, and the job of the bankruptcy court

---

[11]     The Notes of Advisory Committee to Rule 8013 makes clear that the "rule accords to the findings of a bankruptcy judge the same weight given the findings of a district judge under Rule 52 F.R.Civ.P." Thus, the Seventh Circuit's discussion of the Rule 52 is relevant here.

was to apply the law to the facts in the case, we reverse that court's conclusion only if clearly erroneous."); *Dubis v. Zarins (In re Teranis)*, 128 F.3d 469, 471 (7th Cir. 1997) ("Because this appeal presents a mixed question of law and fact, we review for clear error.").

Here, it is undisputed that the legal standard at issue is insolvency—a legal conclusion drawn from the facts of Longview's financial condition at the time of the disputed transfers. Thus, the court reviews the bankruptcy court's finding of solvency for clear error. But because of *Mungo*'s implication that the *de novo* standard may be appropriate, the court has reviewed certain relevant evidence on which the bankruptcy court based its judgment, and the outcome of this appeal would be no different were the bankruptcy court's findings reviewed *de novo*.

### C.    The Bankruptcy Court's Valuation of Longview

#### 1.    Going-Concern Valuation

The first step in valuing Longview as of February 26, 2001–the first known date at issue for purposes of the rule of retrojection–is to determine the proper methodology for valuation. "There is overwhelming authority" that, normally, a going-concern valuation is appropriate when assessing a company's solvency, regardless of whether the entity ultimately did or did not survive as a going concern. 2 COLLIER ON BANKRUPTCY § 101.32 (15th ed.); *see also In re Taxman*, 905 F.2d at 170. Going-concern valuation evaluates an entity as an active unit, "tak[ing] into account the additional value element which flows from the combination of the various assets to an economic unit." 2 COLLIER ON BANKRUPTCY § 101.32. The going-concern valuation is only abandoned if the entity is "on its deathbed." *In re Taxman*, 905 F.2d at 170. Where the assets on which a company can recover in the ordinary course of its business are greater than the total of the cost of realizing on them and other liabilities, a company is not on its deathbed, and the company is valued as a going concern. *Id.* Even if "[t]he deathbed, and death, came later," a going-concern valuation is proper so long as the debtor was not on its deathbed at the time of the transfer in question. *Id.* Indeed, the Seventh Circuit has warned courts not to fall victim to hindsight bias: "Caution should be taken

not to consider property as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin." *Id.* (citation omitted).

Judge Wedoff in this case did not merely adopt a going-concern analysis as the default rule; he also pointed to trial testimony and evidence in support of his determination that Longview was a going concern in February 2001. Longview's founder testified that Longview "'fully intended and expected to restart operations at the Longview smelter (Kolleng Dep. at 128)." *In re Longview*, 2005 WL 3021173, at *7. Likewise, Louis Locke, Longview's plant manager, testified that Longview "plan[ned] to resume operations in the north plant." *Id.* at *3. The bankruptcy court found the testimony of Longview managers that the company planned to resume operations after the curtailment period to be "[a] powerful indication of contemporary, informed opinion as to value." *Id.* at *7.

The Longview Trustee does not dispute that Longview's managers intended to resume operations and profitability after the curtailment period (Reply at 4), but rather contends that management's expectations were irrelevant. The Longview Trustee notes a First Circuit decision holding that neither "the financial outlook of the debtor corporation, [n]or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question" of whether the debtor was a going concern. *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 735 (1st Cir. 1982) (citation omitted). *Robinson* explained that courts should look beyond the debtor's intentions to see whether business is being conducted at the critical date. *Id.* Here, the bankruptcy court did just this, considering both the intention of Longview management and the plans developed to implement those intentions. *In re Longview*, 2005 WL 3021173, at *7.

Illustrating that management's intentions were genuine, Longview "developed and implemented a comprehensive business plan to" resume smelting operation. *In re Longview*, 2005 WL 3021173, at *7. As Locke testified, there had been several prior curtailments at certain segments of the Longview smelter, and there was an elaborate plan in place for re-opening.

(Locke, Trial Tr. Vol. I at 146-47.) Locke explained that he, as well as the employees still on payroll during the curtailment period, worked on that plan to resume operations. (*Id.* at 147-48.) The company had also run financial projections in anticipation of reopening. (*Id.* at 148-49.) Acting upon the budget, Longview allocated the money it received from the BPA in exchange for temporarily curtailing operations to repay its debt on a senior secured bridge note, compensate union employees, fund operating costs, and maintain the viability of the smelter for reopening. *In re Longview*, 2005 WL 3021173, at *3. Longview also contracted with Enron to supply it with electricity and alumina for production of aluminum at the smelter. *Id.* In addition, MAP negotiated with Enron to build a power plant, which would serve as an independent source of electricity for the Longview smelter. *Id.* Based on this evidence, the bankruptcy court concluded that Longview was not on its deathbed as of February 26, 2001 but rather expected to resume operations and profitability after the curtailment period, and acted in accordance with those expectations.

The Longview Trustee does not dispute this evidence, instead focusing on the fact that Longview was not purchasing raw materials to make aluminum, manufacturing aluminum, or making sales on February 26, 2001. (Reply at 5.) As Longview was contractually obligated to curtail operations on that date and for many months thereafter, whether its smelting operations were active cannot be the proper standard for determining whether it was on its deathbed. Neither *Robinson* nor any case cited by the Longview Trustee addresses the question of whether an company that has voluntarily curtailed operations but intends to resume them on a specified future date is a going concern. Because Longview was in voluntary curtailment, Judge Wedoff did not err in his assessment that its development and implementation of a comprehensive plan constitutes conducting business for purposes of a financial analysis.

### 2. Liquidation Valuation

Despite Longview managers' intentions and strategic plans, the Longview Trustee urges that Longview's liquidation value demonstrates that valuing Longview as a going concern was

improper. (*See* Opening Mem. at 14-16.)  Specifically, the Longview Trustee relies on the October 29, 2004 Solvency Report by Brooks D. Myhran (the "Myhran Report") and on Myhran's trial testimony.  Myhran opined that as of February 26,  2001, "the prospects for Longview LLC on a going-forward basis were poor, at best."  (Myhran Rept. at 12.)  Because Myhran's qualifications were unimpeached and the Myhran Report was the only valuation evidence introduced at trial, the Longview Trustee argues, the Bankruptcy Judge was obliged to accept them.  (Opening Mem. at 4.)

A court is not required, however, to adopt an expert's: "opinion evidence is not binding on the fact-finder *even if no contradictory evidence is offered by the other side*."  *Dodge v. Stine*, 739 F.2d 1279, 1284 (7th Cir. 1984) (emphasis added).  Instead, the trier of fact is free to determine what weight to afford the expert's opinion, in light of the expert's credibility, the sufficiencies of the foundations for his or her opinions, and the reliability of the expert's ultimate conclusions.  *See Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("the judge must look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation") (internal quotation marks and citation omitted); *Albers v. Church of the Nazarene*, 698 F.2d 852, 858 (7th Cir. 1983) ("Nor was the jury required to believe the plaintiff's expert witness. . . ."); *United States v. Pittman*, 449 F.2d 623, 628 (7th Cir. 1971) ("the opinion of an expert, even if uncontradicted, is not required to be accepted as such testimony must pass through the screen of the fact trier's judgment of credibility").  Arguing to the contrary, the Longview Trustee relies on *Grochocinski v. Reliant Interactive Media Corp. (In re General Search.com)*, 322 B.R. 836, 850 (Bankr. N.D. Ill. 2005), in which the bankruptcy court held that it "may not arbitrarily reject uncontroverted evidence."  But the *Grochocinski* court acknowledged that "[t]he Court must determine the weight to be attached to the testimony and the inferences to be drawn from the evidence admitted."  *Id.*  It is thus significant that the expert testimony in *Grochocinski* was "credible, unrebutted, and supported by the evidence."  *Id.*  *Grochocinski* does not stand for the proposition that a Bankruptcy Court must accept *all* expert testimony at face value.

14

The trial court's "determination regarding the accuracy of the facts or assumptions on which the expert testimony was based," is itself subject to clear error review. *Contractors Ass'n v. City of Philadelphia*, 91 F.3d 586, 596 (3d Cir. 1996); *see also Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1077 (5th Cir. 1990) (affirming "a judgment as to the relative credibility of the testimony given by the two experts . . . [because s]uch choices are within the province of the court, when sitting without a jury, subject only to the clearly erroneous standard."); *Pampillonia v. Concord Line, A/S*, 536 F.2d 476, 477 n.2 (2d Cir. 1976) (holding that the application of the clearly erroneous standard is "especially so when the trial court's findings involve issues of credibility or the weight to be given to testimony, expert or otherwise").

With this in mind, the court turns to the question of whether the bankruptcy court clearly erred by rejecting Myhran's analysis. Myhran based this opinion, in part, on his projection that the cost to Longview of electricity would rise significantly, rendering it impossible for Longview to resume profitable operations. *In re Longview*, 2005 WL 3021173, at *7-9. According to Myhran, there was a consensus in February 2001 that the costs of electric power would rise to $45 per megawatt hour in 2006. *Id.* at *7. To estimate the cost of electricity to Longview as of the date on which the smelter was expected to reopen, Myhran projected a "straight-line increase" in the cost to Longview of electric power, which tracked market price. *Id.* Judge Wedoff rejected this projection, instead adopting Longview's managers' projection that the cost to Longview of electricity would remain $29.50 per megawatt hour through 2004. *Id.* at *7-9.

In Judge Wedoff's view, the reports on which Myhran relied did not rebut management's projections regarding the costs of electric power. *Id.* at *8. Moreover, he held that market projections alone could not speak to the cost *to Longview* of electric power, because that cost was influenced by the terms of Longview's electric power contract with the BPA, rather than merely market prices. *Id.* at *8. This contract's cost-recovery-adjustment clause ("CRAC") did not directly incorporate market prices, though it did require Longview to compensate the BPA for its cost of

15

purchasing a portion of its energy supply on the open market.  *Id.*  Because the BPA purchases only a portion of its electricity on the open market, the market cost of electricity would have a limited impact on the BPA's ability to meet its contractual obligations.  *Id.*  In other words, the cost to Longview of electricity would not track the market rates unless the cost to BPA rose at market rate and BPA invoked the CRAC.  *Id.* at *9.  The bankruptcy court accordingly rejected Myhran's projections regarding Longview's electricity costs, as well as his projections regarding profitability that were based on those projections.  Judge Wedoff concluded that "it is not possible to accept Myhran's opinion that the smelter could not be operated profitably and that Longview LLC's assets had no value as a going concern on February 26, 2001."  *Id.*

The other evidence on which the Longview Trustee relies is likewise insufficient to demonstrate Longview's insolvency.  That Longview was not purchasing raw materials or making sales as of February 26, 2001 (Reply at 5), is beside the point, as Longview was in voluntary curtailment.  The Longview Trustee also notes the testimony of plant manager Louis Locke that a 2001 "assumption worksheet," from which he worked during the curtailment period, concluded that it would cost $22.5 million to re-open the smelter in 2002, and that the financing was not available to Longview as of 2001.  (Locke, Trial Tr. Vol I at 148-49.)  But Locke had no responsibility for Longview's fundraising or financial operations.  (*Id.* at 150.)  To the contrary, Judge Wedoff concluded that, because Longview had a reasonable prospect of generating positive cash flows, its expected borrowing capacity as of that February 2001 would have been "substantially higher" than $12 to $33 million.  *In re Longview*, 2005 WL 3021173, at *12.  In addition, Longview had a financial partner in MAP, who had agreed to make a $36 million equity investment in a new energy generation facility–for which construction would begin no later than July 1, 2001–if financing was otherwise available.  *Id.*  In other words, the bankruptcy court did not err in declining to deviate from the presumption in support of using a going-concern valuation.

### 3.    Longview Was Solvent on February 26, 2001

Myhran valued Longview on February 26, 2001–the date of the purchase of the smelter–and on April 1, 2002–the date on which the smelter was obligated to begin taking electric power from the BPA, following the curtailment period. (Cover letter to Myhran Rept.) For each valuation date, Myhran constructed a balance sheet that he characterized as consistent with section 101(32)(A) of the Bankruptcy Code, and prepared financial projections based upon those balance sheets. (*Id.*) Myhran concluded that on February 26, 2001 Longview had assets totaling $248.1 million dollars and liabilities totaling $367 million. (Myhran Rept. at 6.) When valuing Longview, Myhran considered two scenarios: one in which Longview resumed operations at the smelter after the curtailment period, and one in which Longview never resumed operations. (*Id.* at 12.) Under either of these scenarios, Myhran concluded that Longview was insolvent on February 26, 2001. (*Id.* at 22, 33.)

Myhran's analysis of Longview's assets rested on two basic conclusions: first, were Longview to begin operating the north plant smelter after the curtailment period, it would generate significant losses rather than profits. (*Id.* at 19.) Second, Myhran concluded that Longview would need substantial external resources to finance its resumed operations, which it would not have been able to secure. (*Id.* at 22.) As explained above, the bankruptcy court rejected the underlying conclusion that it was evident in February 2001 that Longview could not resume profitable operations in 2002. *In re Longview*, 2005 WL 3021173, at *9. For the same reasons, as of February 2001 Longview could have reasonably expected to secure additional financing in 2002. *Id.* at *12. Having rejected the premises underlying Myhran's analysis, the bankruptcy court ultimately discarded Myhran's opinion that Longview's assets had no value as a going concern on February 26, 2001. *Id.* at *9. Instead, Myhran ought to have recognized a going concern value for Longview, *see id.* at *7, which would have required him to consider as an asset the additional value that Longview had as a functioning entity. *See* 2 COLLIER ON BANKRUPTCY § 101.32. Myhran did not do so. Thus, the bankruptcy court was unable to draw any conclusion regarding Longview's

solvency on that date. *In re Longview*, 2005 WL 3021173, at *9. With no first known date of insolvency, the bankruptcy court could not apply the rule of retrojection and could not conclude that Longview was insolvent on the date of the disputed transfers. *Id.* The Trustee has not established that this holding was in error.

Moreover, even if Myhran's valuation of Longview's assets were proper, the bankruptcy court also rejected Myhran's valuation of Longview's liabilities. Of the liabilities that Myhran calculated, the bankruptcy court found no fault with three–a $33 million "curtailment period union obligation;" a $167.1 million "senior secured bridge note" obligation; and a $7.3 million "due to affiliate" obligation–which total $207.4 million. *In re Longview*, 2005 WL 3021173, at *9 n.11. But several of Longview's other liabilities are disputed: $42.7 million in pension liability; $20.6 million in "take-or-pay" liability (in other words, that Longview would pay for the electricity whether or not Longview actually used it) to BPA under the Block Power Sales Agreement; $36 million in liability for building a power generation facility; $50 million in post-retirement benefit liability to the union; and $6 million in alumina supply agreement liability. (Myhran Rept. at 6.) The dispute surrounding these liabilities is an independent reason that the bankruptcy court could not determine that Longview was insolvent in February 2001.

The Longview Trustee contends that Longview was liable for $42.7 million in pension contributions regardless of whether the Longview smelter ever resumed operations. (Opening Mem. at 19.) This pension liability was technically one that McCook bore under its defined benefit plans, but Longview was mutually liable under ERISA, if McCook failed to meet its obligations. *In re Longview*, 2005 WL 3021173, at *9. The bankruptcy court properly noted that the Longview Trustee never clarified whether Longview had pension liability in February 2001 and, if so, how much existed and how much was attributable in the first instance to Longview. *Id.* In fact, it was not until the fall of 2001 that McCook missed any of its minimum pension funding obligations, and not until 2002 that liens were asserted against Longview in connection with those pension

obligations. *Id.* at *10. Thus, the extent of Longview's liability in February 2001, if any, is unclear. The Longview Trustee counters, first, that it is "inconceivable" that Longview did not know that its affiliate was in troubled financial circumstances in February 2001. (Opening Mem. at 19-20.) This assertion, however, is not supported by any facts in the record and therefore cannot be credited. Next, the Longview Trustee argues that knowledge of the pension liability is irrelevant, relying on *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992). The issue in *Central States*, however, was whether defendant was aware of his obligations and thus could be held liable for them once they were triggered, *id.* at 1372; there is no dispute, here, as to whether Longview was aware of its ERISA obligations. Instead, the question is whether Longview could have known that McCook would default, thereby triggering those obligations. Thus, the *Central States* court's discussion of controlled group liability does not speak to the issue of including pension obligations when valuing an entity.

Even assuming that Longview's liability for McCook's pension obligations was apparent in February 2001, that liability would have been contingent; contingent liabilities may be discounted by the possibility of their coming to fruition. *Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 659 (7th Cir. 1992); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real."). Myhran included 100% of the pension obligation as a liability when assessing Longview's solvency. This was improper without a basis for concluding that there was a 100% certainty that McCook would default on its obligations or that the entire default would fall on Longview's shoulders. Accordingly, the bankruptcy court properly declined to include the $42.7 million figure in its evaluation of Longview's liabilities as of February 26, 2001.[12]

---

[12]     The bankruptcy court also properly declined to consider certain other liabilities that were contingent and were not discounted based on the probability that they would occur. For example, the Longview Trustee's only argument for including the $50 million post-retirement benefit
(continued...)

19

The Longview Trustee contends that the $36 million commitment to build a power plant should be considered a Longview liability because Longview, as an affiliate of MAP, was obligated by it. (Opening Mem. at 18.) The bankruptcy court observed that the letter of understanding regarding the power generation facility bound MAP to finance the operations from its own funds "if it is necessary to complete the financing." *In re Longview*, 2005 WL 3021173, at *10. Thus, even if Longview were bound by MAP's commitment, which is far from clear, this commitment would still be a contingent liability, which ought to have been discounted by the possibility of its occurring. *Covey*, 960 F.2d at 659; *In re Xonics*, 841 F.2d at 200. Myhran included 100% of the commitment as a liability because he determined that as of February 26, 2001 there was a 0% chance that Longview would ever resume profitable operations. (Reply at 8-9.) As the court has already rejected this premise, the contingent liability ought to have been discounted, and the bankruptcy court properly declined to include the full sum as a Longview liability.

Next, the Longview Trustee argues that the $20.6 million in take-or-pay liability to BPA for purchasing electricity should have been considered a Longview liability. (Opening Mem. at 18-9.) He notes that the BPA eventually filed a claim for $49 million, underscoring that Myhran's estimate was conservative. (*Id.*) The Bankruptcy Court rejected this liability based on its finding that Myhran improperly calculated the price to Longview of electric power. *In re Longview*, 2005 WL 3021173, at *11. As discussed above, the court finds no clear error in the bankruptcy court's refusal to adopt Myhran's projected prices for electric power. Furthermore, that BPA has filed a claim against

---

[12](...continued)
liability is that Longview could not have resumed operations on April 1, 2002. (Opening Mem. at 18.) Similarly, while Longview was contractually obligated to a liquidated damages of up to $6 million, that liability would arise only if Longview failed to honor its contractual obligation to purchase alumina from Reynolds. (*Id.* at 19.) Because there was as of February 2001 a real chance that Longview would resume operations, the bankruptcy court properly found that these contingent liabilities should have been discounted by the probability that they would occur. For the same reason, the bankruptcy court properly excluded the $4.5 million severance payment to Longview's salaried employees. *In re Longview*, 2005 WL 3021173, at *11.

Longview does not mean that this claim was knowable on February 26, 2001. *Cf. In re Taxman*, 905 F.2d at 170 (warning courts not to fall victim to hindsight bias when deciding whether a company was on its deathbed or a going concern).

As the bankruptcy court concluded, the Myhran Report and testimony provided an insufficient basis for valuing either the assets or the liabilities of Longview as of February 26, 2001. The Longview Trustee therefore did not meet its burden of proving that Longview was insolvent as of that date. If Longview was not proven to be insolvent on February 26, 2001, the Longview Trustee cannot prove insolvency by the rule of retrojection, and Longview's solvency in April 2002 is irrelevant. There was thus no error in the bankruptcy court's failure to value Longview as of April 2002.

## IV.    Undercapitalization

Finally, the Longview Trustee argues that the transfers at issue here are recoverable even without a finding of insolvency because Longview was undercapitalized at the time of the transfers. (Opening Mem. at 11-13.) A trustee may avoid a debtor's transfer made on or within one year before the date of the filing of the petition if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and had an "unreasonably small capital" to operate its business. 11 U.S.C. § 548(a)(1). Likewise, under the UFTA, a debtor's transfer is fraudulent as to a creditor if the debtor did not receive "a reasonably equivalent value in exchange for the transfer" and the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." 740 ILCS 160/5(a); *see also* 11 U.S.C. § 544(b); *Leibowitz*, 139 F.3d at 576-77. As with section 6 of the UFTA, section 5 is similar to the corresponding Bankruptcy Code provision, except for its limitations period. If the Longview Trustee may avoid Longview's transfer under sections 544 or 548, the Trustee may also recover the value of the property transferred. 11 U.S.C. § 550(a).

Thus, the Longview Trustee may recover the value of a disputed transfer if: (1) The property transferred belonged to Longview; (2) Longview did not receive a reasonably equivalent value in exchange for the transfer; and (3) Longview had an unreasonably small capital to operate its business at the time of the transfer. *See* 11 U.S.C. §§ 544(b), 548(a)(1), 550(a); 740 ILCS 160/5(a). In this appeal, the only contested element is whether Longview had an unreasonably small capital to operate its business between February 26, 2001 and April 1, 2002, the time of the disputed transfers. (*See* Opening Mem. at 2-3.) To avoid the disputed transfers, the Longview Trustee must prove by a preponderance of the evidence that Longview was undercapitalized at the time of the disputed transfers. *See Frierdich*, 294 F.3d at 867; *Grogan*, 498 U.S. at 286.

"Undercapitalization is a question of fact, and we review the bankruptcy court's judgment for clear error." *In re Lifschultz Fast Freight*, 132 F.3d 339, 349 (7th Cir. 1997). Neither the Bankruptcy Code nor the UFTA defines the term "unreasonably small capital." Courts have held, however, that "an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." *In re Doctors Hosp.*, 360 B.R. at 870, quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). The proper test is objective: the court should ask whether the parties' projections regarding the ability to sustain operations were reasonable. *Id.*, quoting *Moody*, 971 F.2d at 1073. So long as those projections were reasonable at the time they were made, they will not be rejected simply because they were ultimately proven wrong. *Moody*, 971 F.2d at 1074.

At trial, the Longview Trustee's only evidence that Longview was undercapitalized was Myhran's expert opinion. *In re Longview*, 2005 WL 3021173, at *12. The bankruptcy court provided substantial analysis for its determination that Mr. Myhran's opinion was "unpersuasive," *see id.*, and the court cannot deem it clear error. As explained earlier, Myhran failed to establish that Longview would not be able to operate profitably when the smelter re-opened. *Id.* Yet Myhran underestimated Longview's borrowing capacity because he assumed that Longview would not be

able to operate profitably. *Id.* Having rejected this assumption, the bankruptcy court concluded that Longview would have had a borrowing capacity of more than $12 million to $33 million in 2002. *Id.* In addition, Myhran failed to consider that MAP, which had agreed with the unions to make a $36 million equity investment in a new energy generation facility, was thus Longview's financial partner. *Id.* Based on these facts, the bankruptcy court rejected Myhran's opinion that Longview could not finance a reopening of the smelter. *Id.* Thus, the Bankruptcy Court found that the Longview Trustee failed to meet its burden of proving that Longview was unreasonably undercapitalized. *Id.*

Aside from Myhran's opinion, the only evidence regarding Longview's capitalization is the testimony of Longview managers that Longview intended to resume operations after the curtailment period, and accompanying plans to do so. *In re Longview*, 2005 WL 3021173, at *3. The bankruptcy court was entitled to credit this evidence. *See* FED R. BANKR. P. 8013. Having done so, it was not clearly erroneous for the bankruptcy court to conclude that the Longview Trustee had not proven by a preponderance of the evidence that Longview was undercapitalized. As Longview was not undercapitalized on February 26, 2001, the Longview Trustee cannot prove undercapitalization by the rule of retrojection, and Longview's solvency in April 2002 is irrelevant.

## V.    Cross-Appeal

Defendants raise two issues on cross-appeal. First, Jenkens argues that, under the doctrines of collateral estoppel and law of the case, the Longview Trustee was bound by factual findings in *In re McCook*, 319 B.R. 570. (Defs.' Mem. at 28.) Defendants acknowledge that the issue is "academic" in light of Judge Wedoff's, and now this court's, conclusion based on the evidence in this case that Longview was not insolvent as of February 26, 2001. (Joint Reply and Sur-Reply of Appellees/Cross-Appellants at 13.) Consequently, there is no reason for the court to consider this issue.

Second, Jenkens, Samuel, and Dynegy argue that certain expert reports and/or testimony

was wrongly excluded at trial, apparently as a Rule 37(c)(1) discovery sanction.  (Defs.' Mem. at 28.)  Were the court to reverse Judge Wedoff's decision and find that Longview was insolvent at the time of the disputed transfers, Defendants would seek further proceedings in which the Peltz and Malek testimony would be considered.  (*Id.* at 36.)  Again, this cross-appeal is moot and therefore the court will not decide it.

## **CONCLUSION**

The bankruptcy court's holding that Longview was neither insolvent nor undercapitalized during the time of the disputed transfers was not clearly erroneous.  Thus, the Longview Trustee is not entitled to avoid the disputed transfers and recover the value of the transferred property.  The decision of the bankruptcy court is affirmed.

ENTER:

Dated: December 4, 2007                    REBECCA R. PALLMEYER
                                                       United States District Judge